IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

JOHNNY LACY, JR,

Plaintiff,

v.

SANDRA MCARDLE and KENNETH MILLER,

Defendants.[1]

OPINION and ORDER

20-cv-1014-jdp

Plaintiff Johnny Lacy, Jr., a prisoner in the custody of the Wisconsin Department of Corrections, has suffered from diabetes for many years, with increasingly serious consequences. In December 2017, surgeons removed Lacy's fourth and fifth toes on his left foot. Two weeks later, surgeons took his left foot, and shortly after that, his left leg below his knee.

Lacy alleges that two prison healthcare providers—physician Kenneth Miller and nurse practitioner Sandra McArdle—could have prevented the amputations if they had acted with more urgency when Lacy first complained to them about an ulcer on his left foot. He contends that both defendants violated his right to medical care under the Eighth Amendment.

Both defendants move separately for summary judgment on similar grounds. Dkt. 70 and Dkt. 77. They say that it was reasonable for them to believe, based on the information they had, that Lacy didn't need emergency care, and that, even if they had known how serious the situation was, it was too late for them to do anything about it.

The court will grant the motions in part and deny them in part. A reasonable jury could find that both defendants knew that they needed to treat Lacy's foot ulcer with urgency, but

---

[1] The court has removed from the caption all parties who were previously dismissed voluntarily from the case.

they refused to do so. It is also reasonable to infer that Lacy's pain could have been lessened if defendants had acted more swiftly. But Lacy does not have admissible evidence that defendants could have prevented his amputations if they had referred him for vascular treatment on December 15 (when Miller first learned about Lacy's ulcer) or December 18 (when McArdle reviewed Lacy's requests for help) rather than waiting to send him to the hospital on December 24. Defendants have experts who have explained why they believe that the amputations were inevitable consequence of Lacy's microvascular disease. But Lacy's experts do not explain how vascular treatment nine days earlier would have made a difference. Lacy's failure to submit admissible expert testimony on that issue is fatal to his claim for damages based on the amputations. The case will proceed to trial on the questions whether defendants violated the Eighth Amendment and whether defendants caused Lacy unnecessary pain.

## BACKGROUND

The following facts are undisputed unless otherwise noted.

Lacy was diagnosed with diabetes in 1994. Among other things, diabetes can damage a person's blood vessels, impairing blood flow and the body's ability to heal. People with diabetes are also more likely to develop blisters and ulcers.

On December 10, 2017, Lacy was housed in the Wisconsin Secure Program Facility, which is in Boscobel, Wisconsin. He submitted a health services request that stated the following:

> I've expressed to you how the combination of graham crackers and peanut butter affects my vision, now it's affecting my feet too! I have a sore between my toes! Plus, my eyes/vision is changing and thus far, you have been "deliberately indifferent to this very serious medical need!" I need to see the eye doctor, and my diabetic diet changed.

2

Dkt. 106-2. McArdle, a nurse practitioner, reviewed the request the next day and ordered that Lacy be seen by a doctor. She is not responsible for scheduling the appointments.

On December 13, 2017, Lacy submitted another health service request. It stated:

> I requested to see the Dr. last week regarding this sore [in]between the toes on my left foot. It[']s gotten bigger during your deliberate indifference and its hard for me to walk. I need a [illegible] and antibiotics and [illegible].

Lacy had an appointment with Miller, a physician, on December 15 to assess the sore. Lacy told Miller that he was in severe pain. Initially, Lacy would not allow Miller to touch his foot because it was too painful, but he relented after Miller told him that it was necessary.

In his progress note, Miller wrote that Lacy had an ulcer that was 2cm in diameter on the fifth toe of his left foot. Dkt. 73-9, at 15. Miller described the ulcer as "stage 3" and "deep penetrating." Miller observed that the fourth and fifth toes were swollen, and they were "a little darker." Dkt. 73-2 (Miller Dep. at 61:13–23). The ulcer itself was "reddish," but it wasn't bleeding. The absence of blood told Miller that the tissue was "without good blood supply." *Id.* at 60:5–16. Miller was concerned about whether the "ulcerated area might still support life," but he says that he believed that the tissue wasn't dead "because of the color and because [Lacy] was having pain." *Id.* at 60:20–24.

Lacy objected to Miller or anyone else cleaning the wound because of concerns it would be too painful, but he again relented after reassurances by Miller. After cleaning the wound, Miller dressed Lacy's foot with sterile gauze to immobilize the foot and toe without cutting off circulation. (The parties dispute whether Miller also treated the wound with antibiotic ointment.)

In the order portion of his progress note, Miller wrote, "Dress ulcer daily [with] bacitracin and gauze." Separately, Miller submitted a "prescriber's order" that stated,

"Bacitracin oint use on foot ulcer [with] dressing daily [for] 3 months." Dkt. 73-9, at 18. Miller also prescribed Excedrin for pain and ordered a reevaluation in 30 days. *Id.*

On December 18, McArdle reviewed an "interview/information request" and a health service request that Lacy had submitted the previous day. In the interview/information request, Lacy wrote that the sore was so painful that he could barely walk. In the health services request, Lacy wrote that the pain from the ulcer was "increasing 10-fold" and it was "eating up [his] ligaments." Lacy asked for "pain relief" and an appointment with a podiatrist. In response, McArdle wrote that she was referring Lacy to a podiatrist.

No healthcare provider examined Lacy after December 15 until December 24. On December 23, Lacy submitted an interview/information request to the health services unit manager in which he wrote that "something [is] eating [his] body parts" and he needs "emergency medical care." Dkt. 106-8.[2]

The following day, Lacy was examined by a prison nurse, who noted that two of Lacy's toes were "necrotic (black)." Dkt. 111, ¶ 87. Lacy was sent to an emergency room in Boscobel and then transferred to University of Wisconsin Hospital in Madison. Hospital staff diagnosed Lacy with gangrene in his fourth and fifth toes on his left foot.

On December 25, Lacy's fourth and fifth toes were amputated. On December 27, hospital staff performed angiograms and angioplasties of Lacy's left anterior tibial artery and left tibial peroneal trunk. Staff recommended that Lacy receive additional post-surgical wound

---

[2] Lacy says in his proposed findings of fact that he submitted a health service request in which he wrote that his "little toe is falling off and its spread to the other toe." Dkt. 111, ¶ 86. But the document he cites is the December 23 interview/information request, and it doesn't include the language Lacy quotes.

debridement and wound vacuum placement, but Lacy "elected to leave against medical advice," Dkt. 113, ¶ 129, and he returned to the prison on December 28.

On December 29, Lacy "agreed to go back to the hospital." *Id.*, ¶ 136. Lacy "was not able to be immediately readmitted to UW Hospital," Dkt. 110, ¶ 182, so prison staff cared for Lacy until January 3, when Lacy returned to the hospital. He received another angiogram and angioplasty of his left lower leg, which revealed that Lacy's arteries were occluded again. Lacy's left foot was amputated the same day.

Lacy's condition did not improve. On January 10, 2018, Lacy's leg was amputated below his knee.

The court will discuss more facts as they become relevant to the analysis.

## ANALYSIS

### A.  Legal standard

The standard for an Eighth Amendment claim about medical care is based on the concept of "deliberate indifference," which means that the defendant knows the prisoner needs medical treatment, but the defendant is disregarding that need. *See Forbes v. Edgar*, 112 F.3d 262, 266 (7th Cir. 1997). The plaintiff must prove four things on an Eighth Amendment medical care claim: (1) the plaintiff had a serious medical need; (2) the defendant was aware that the plaintiff had a serious medical need; (3) the defendant consciously failed to take reasonable measures to provide treatment for the serious medical need; and (4) the plaintiff was injured because of the defendant's action or inaction. Federal Civil Jury Instructions of the Seventh Circuit § 7.17 (2017).

Lacy's basic theory of the case is that the symptoms he presented to defendants in December 2017 showed that he needed emergency care in the form of vascular treatment such as an angioplasty, but both defendants disregarded Lacy's health by failing to either provide that care or reasonably investigate whether he needed it. If defendants had taken his situation more seriously, Lacy says, he could have saved his left leg or at least alleviated some of his pain.

Defendants don't challenge for the purpose of their summary judgment motions that Lacy had a serious medical need or that they were aware he had a serious medical need.[3] Instead, defendants say that they acted reasonably based on the information they had and that there is no causal connection between any of their alleged failures and Lacy's injuries.

On a motion for summary judgment, the question is whether there are any genuine factual disputes that could make a difference to the outcome of the case, or, stated another way, whether a reasonable jury could find for the nonmoving party, after drawing all reasonable inferences in that party's favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Loudermilk v. Best Pallet Co., LLC,* 636 F.3d 312, 314–15 (7th Cir. 2011); *Montgomery v. American Airlines, Inc.*, 626 F.3d 382, 389 (7th Cir. 2010). The court will first consider whether Lacy has

---

[3] McArdle says that she wasn't aware of an "excessive risk" to Lacy's health. Dkt. 78, at 12. The substance of this argument is that McArdle acted reasonably based on the information that she had, so it is really an argument that she did not consciously fail to take reasonable measures to treat Lacy. If McArdle means to contend that she wasn't aware that Lacy had a serious medical need, a reasonable jury could find otherwise because McArdle admits that Lacy "needed to be seen," Dkt. 87 (McArdle Dep. 83:3–12), and she referred him to a podiatrist, which suggests that McArdle believed that Lacy had a serious medical need. *See King v. Kramer,* 680 F.3d 1013, 1018 (7th Cir. 2012) ("An objectively serious medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention" (internal quotation marks omitted)).

adduced evidence that defendants consciously failed to take reasonable measures to provide treatment and then whether there is evidence of causation.

## B. Conscious failure to take reasonable measures

### 1. Miller

Lacy's claim against Miller is limited to Miller's decisions during one appointment with Lacy on December 15, 2017. Lacy contends that Miller should have been alarmed by the presence and severity of the ulcer on Lacy's foot, so Miller should have referred Lacy for emergency care or at least conducted basic tests to assess Lacy's blood flow and identify possible inflammation and infection. Lacy could show that Miller consciously failed to take reasonable measures directly with evidence of Miller's mental state or indirectly with circumstantial evidence that Miller's conduct was a substantial departure from accepted professional judgment, practice, or standards. *Brown v. Osmundson*, 38 F.4th 545, 550 (7th Cir. 2022).

Miller admits that he knew on December 15 that Lacy was diabetic, that diabetes is associated with poor blood flow, that the area around the ulcer didn't have good blood supply because the ulcer wasn't bleeding, that poor blood flow makes it harder for a foot ulcer to heal, and that diabetic foot ulcers can progress rapidly. *See* Dkt. 111, ¶¶ 52–55. Miller also admitted that Lacy complained to him that his foot was in great pain during the examination, that Lacy's toes were discolored, and that Miller was concerned about whether the "ulcerated area might still support life." Dkt. 73-2 (Miller Dep. at 60:20–24). Miller's own notes describe the ulcer as "deep" and "penetrating." Despite Miller's concern and knowledge, Miller didn't treat Lacy's situation as urgent.

Lacy's experts also identify simple tests that Miller could have performed to better assess whether Lacy required emergency treatment. *See* Dkt. 97, at 17–19.  They focus on a test that

involves feeling for the presence or absence of pulses in the feet, called the pedal pulses, which are used to ascertain the quality of blood flow to the foot.  Alternatively, the capillary refill test checks for blood flow by pressing on affected area to push the blood out and waiting to see how long it takes to come back). *Id.* at 14, 18.[4] If these tests show that blood flood is insufficient, referral to a vascular specialist is necessary to increase blood flow through a procedure such as an angioplasty. *Id.* at 9, 14, 18.

Miller acknowledges that these tests can be used to assess blood flow, and he admits that he didn't perform either of them. Dkt. 111, ¶ 54. He also doesn't identify any other tests he performed instead to determine whether Lacy required emergency treatment. From these facts, a reasonable jury could infer that Miller knew that cleaning and bandaging the wound wasn't providing reasonable treatment to Lacy or at least that he strongly suspected that and refused to verify it. *See Pyles v. Fahim*, 771 F.3d 403, 412 (7th Cir. 2014) ("[I]f the need for specialized expertise either was known by the treating physicians or would have been obvious to a lay person, then the obdurate refusal to engage specialists permits an inference that a medical provider was deliberately indifferent to the inmate's condition.") (internal quotation marks omitted)); *Berry v. Peterman*, 604 F.3d 435, 441 (7th Cir. 2010) ("[A] doctor's choice of the easier and less efficacious treatment for an objectively serious medical condition can . . . amount to deliberate indifference for purposes of the Eighth Amendment.") (internal quotation marks omitted)); *Ortiz v. Webster*, 655 F.3d 731, 735 (7th Cir. 2011) ("Physicians cannot

---

[4] Lacy's experts also say that Miller should have performed tests to detect possible infection (the probe-to-bone test and a culture-and-sensitivity test), but tests performed later were negative for infection or growth of bacteria, Dkt. 113, ¶¶ 119 and 121, and Lacy doesn't identify how either test would have made a difference to Lacy's condition, so the court will not consider those other tests.

escape liability simply by refusing to verify underlying facts regarding the potential need for treatment." (internal quotation marks omitted)).

Miller resists this conclusion, contending that both his failure to recognize the need for emergency treatment and his failure to conduct a more thorough examination were reasonable. As for Miller's failure to arrange emergency care for Lacy, Miller says in his brief that it was reasonable for him to believe that conservative treatment would be sufficient because Lacy had a long history of blisters on his lower extremities, and the blisters always healed with conservative treatment. There are multiple problems with this argument.

First, Miller cites no evidence in his proposed findings of fact that he relied on Lacy's medical history when determining how to treat Lacy or that he was even aware of that history. And it's reasonable to infer that he wasn't aware of it because Miller's interaction with Lacy was limited. As Miller himself emphasizes, he was a locum tenens physician at the prison. Dkt. 110, ¶¶ 13–14. He points to few other interactions he had with Lacy, and he doesn't point to any past instances in which he successfully treated one of Lacy's blisters or ulcers. Miller cannot support his decision with a medical judgment that he never made. *See LaBrec v. Syed*, No. 19-cv-804-jdp, 2023 WL 1505603, at *3 (W.D. Wis. Feb. 3, 2023) (prisoner's medical history not relevant on Eighth Amendment claim unless the defendant was aware of that history and relied on it).

Second, even if Miller knew about Lacy's past blisters and ulcers, Miller does not cite any evidence suggesting that they were similarly serious to Lacy's December 15 foot ulcer. Miller relies primarily on Lacy's own testimony rather than medical records to show that conservative treatment had worked for Lacy in the past, but Lacy referred only to blisters, not ulcers, and he said that they had been treated by wrapping them in a cast. *See* Dkt. 110, ¶ 79

(citing Dkt. 85 (Lacy Dep. 69:16–22, 102:6–10, 106:1–4).[5] In Miller's reply to Lacy's response to Miller's proposed findings of fact, Miller cites one of Lacy's medical records that refers to a "[l]eft lower leg ulcer [that] has healed," Dkt. 110, ¶ 82 (citing Dkt. 73-8, at 4), but the record provides no details about the treatment that was provided. And Miller cites no evidence that any past blister or ulcer was serious enough to cause concern.

In contrast, Miller described the ulcer that he treated as "deep" and "penetrating," and Miller was concerned that the surrounding tissue couldn't support life. Miller described the ulcer in his notes as "stage 3." Miller's notes don't explain what that means, but one of Lacy's experts, Michael Warshaw, says that stage 3 on the scale for grading diabetic foot ulcers indicates "bone involvement," meaning that the wound penetrates to the bone, which would indicate an emergency. Dkt. 97, at 8, 17. Miller doesn't contradict that opinion, but he says that he mistakenly used a different scale for "pressure ulcers," under which stage 3 means the wound was through the skin but did not extend into muscle, bone, or supporting structures. But drawing all reasonable inferences in Lacy's favor, a jury could find that Miller knew what the proper scale was and that was the scale he used.

Miller also acknowledged in both his notes and his deposition testimony that Lacy told him that the ulcer was extremely painful, and it is reasonable to infer from Lacy's health service request that Miller knew that Lacy had difficulty walking because of the ulcer. Miller cites no

---

[5] Neither side clearly explains the difference between a blister and an ulcer, but Lacy's expert Warshaw explains that a blister may become an ulcer when it doesn't heal properly, Dkt. 97, at 7, which suggests that the presence of an ulcer is more serious than a blister. *See also* Healthline, "Blisters on Feet: What You Need to Know," https://www.healthline.com/health/blisters-on-feet ("A blister is a small pocket of fluid that forms on an area of the body."); Cleveland Clinic, "Foot and Toe Ulcers," https://my.clevelandclinic.org/health/diseases/17169-foot-and-toe-ulcers ("An ulcer is an open wound or sore that will not heal or keeps returning.").

evidence that any past blister or ulcer had anywhere near the same effect on Lacy.[6] Miller says in his brief that he discounted Lacy's pain because Lacy was always complaining about pain. But this explanation also has multiple problems. Again, Miller cites no evidence that he knew about past pain complaints from Lacy. In any event, Lacy's medical history shows that he suffered from numerous chronic conditions that *were* painful, including arthritis, fibromyalgia, neuropathy, and degenerative joint disease, Dkt. 113, ¶ 21, and he has been treated for that pain with different medications, including methadone, *id.*, ¶¶ 27–28. Miller points to nothing in Lacy's medical history suggesting that he had lied about having painful ulcers before or that Miller had any reason to believe that Lacy was exaggerating. Rather, Miller says that he was reluctant to touch Lacy's feet because he was in so much pain. Dkt. 110, ¶ 123.

Third, Lacy's blisters were getting worse and more frequent. Miller cites evidence that Lacy had been getting blisters since 2013, Dkt. 110, ¶ 80, but Miller also cites evidence that the blisters didn't start becoming larger and more numerous until May 2017, *id.*, ¶ 81. Miller treated Lacy for blisters in October 2017, *id.*, ¶¶ 95–96, but he cites no evidence that those blisters had healed by December. In fact, defendants assert that Lacy's condition had been getting worse for months or years, *see, e.g.,* Dkt. 93, at 2, which is not consistent with a contention that Miller had no cause for concern.

---

[6] *See* American Academy of Dermatology Association, "Diabetes: 12 Warning Signs that Appear on Your Skin," https://www.aad.org/public/diseases/a-z/diabetes-warning-signs ("[Diabetic] blisters are not painful.").

11

As for failing to conduct more testing, Miller doesn't challenge the opinions of Lacy's experts that the pedal pulse test and the capillary refill test can be useful and important. But he says that he had good reasons for not conducting the tests.

As for the failure to feel for the pulses in Lacy's foot or conduct the capillary refill test, the only reason Miller cites in his proposed findings of fact is that Miller was concerned that Lacy wouldn't let Miller touch Lacy's feet because he was in too much pain. Dkt. 110, ¶ 123.[7] But a reasonable jury would not be required to accept that explanation as an exercise of medical judgment. A healthcare provider is not required to force a prisoner to accept care, but Miller points to no evidence that Lacy refused any care because of his pain. Miller says that Lacy was reluctant throughout the exam to let Miller touch him, but Miller also says that Lacy agreed each time to allow it after Miller explained it was necessary for his treatment. Miller provides no reason why he believed that Lacy wouldn't submit to a pedal pulse assessment if Miller told him it was necessary.

In his brief, Miller says that he also declined to check Lacy's pedal pulses because they wouldn't have provided new information. He points to medical records between April 2016 and September 2017 showing that Lacy's pulses in his feet were nonpalpable or barely detectable before December 2017. Dkt. 110, ¶¶ 83, 84, 90. But, yet again, Miller cites no evidence that he considered these records when assessing Lacy or even that he was aware of the records. All of the cited records are from an offsite medical provider, and Miller doesn't say that he ever reviewed them.

---

[7] Miller doesn't discuss the capillary refill test specifically in his proposed findings of fact, but the court will assume that Miller's reasons for failing to check pedal pulses and capillary refills are the same.

But even if Miller had reviewed the records of Lacy's past pedal pulses, this wouldn't necessarily help Miller. As already noted, Miller admitted that weak pedal pulses are an indicator of weak blood flow in the patient's foot and that weak blood flow means that a wound will have more difficulty healing. So if Miller already knew that Lacy had nonpalpable or barely detectable pedal pulses, a reasonable jury could infer that Miller also knew that Lacy's ulcer likely wouldn't heal through conservative treatment. Even if Miller was aware that Lacy's blisters and ulcers had been treated conservatively in the past, that wouldn't be dispositive because Lacy cites evidence in the form of a July 2017 document prepared by McArdle that Lacy had no history of foot ulcers. Dkt. 106-1. So a reasonable jury could find that a new ulcer on Lacy's toes was an obvious red flag that required aggressive treatment or investigation in light of Lacy's weak blood flow in his feet.

Miller attempts to deflect responsibility for the failure to act sooner by pointing to nursing staff. He says that on December 15 he directed nurses to assess Lacy's condition daily, and he was relying on them to say something if Lacy's condition deteriorated, but they failed to do that. Any failure by the nurses wouldn't relieve Miller of responsibility for his own conduct on December 15. But even if the court assumes that Miller could pass the buck to nursing staff, Miller isn't entitled to summary judgment on that ground because the record is unclear regarding what orders Miller meant to give the nurses. The relevant portion of Miller's written order doesn't direct the nurses to assess or monitor Lacy's ulcer, and it doesn't specifically direct the nurses to do anything. It says, "Dress ulcer daily [with] bacitracin and gauze."[8]  The order doesn't say whether the nurses or Lacy are supposed to change his dressing,

---

[8] Miller says that he also verbally communicated his order to nursing staff, Dkt. 110, ¶ 134, but he doesn't identify to whom he spoke, and he cites no logs or any other corroborating

and it doesn't say what any nurse who might be changing Lacy's dressing should be looking for to determine whether the ulcer is getting worse or requires treatment.

It's undisputed that Lacy had his own wound care kit and had treated his own blisters in the past, Dkt. 85 (Lacy Dep. 63:17–64:10); Dkt. 113, ¶¶ 80, 89, so he wouldn't necessarily have needed assistance from a nurse to change his dressing. Michael Kemerling, the only member of the nursing staff to testify, said that Miller's order was vague, and he didn't know how to interpret it, Dkt. 89, at 41:6–42:19, which is some evidence that a doctor would generally state more clearly what the nursing staff is supposed to do if the order was directed at the nurses. This conclusion is also supported by the fact that Miller provided no guidance to the nurses on what they should look for when changing Lacy's dressing.

Miller says that he *intended* for nursing staff to interpret his order as requiring them to assess Lacy's wound daily. If that's true, Miller couldn't be held liable under the Eighth Amendment simply because he was negligent in failing to articulate his intentions more clearly. *See Vance v. Peters*, 97 F.3d 987, 992 (7th Cir. 1996) (negligence or inadvertent error does not violate the Eighth Amendment). But the order is vague enough to support a reasonable inference that Miller did not intend for nurses to provide follow-up care.

The bottom line is that Miller was aware of several warning signs that would allow a reasonable jury to find that Miller knew that Lacy needed emergency care, but Miller chose not to provide that care or to conduct any tests that would help him better determine whether such care was needed. Miller is free to explain at trial why he believes his actions were

_____

evidence, so a reasonable jury wouldn't be required to credit that testimony. In any event, Miller doesn't say that his verbal order was any different from his written order, except that he says he verbally told staff that Lacy should receive his medication that night. *Id.*

reasonable based on the information he had. But the jury wouldn't be required to credit those reasons based on the current record, so Miller isn't entitled to summary judgment on that ground.

### 2. McArdle

Lacy's claim against McArdle is based solely on her response to two communications that she received from Lacy on December 18. In an interview/information request, Lacy wrote: "This sore between my toes is truly painful, and I can barely walk. It[']s so tender, it radiates pain throughout my foot and up my thighs." In a health services request, Lacy wrote:

> I would very much like to see the p[o]diatrist at Gunderson. As my pain is increasing 10-fold. This ul[c]er between my toes is eating up my ligaments because the pain is shooting to the back of my foot and up my leg. I don't need to be sedated, I need pain relief and I need it bad.

In response, McArdle wrote that she would refer Lacy to a podiatrist.

Lacy says that McArdle knew that Lacy's condition was serious, so she should have examined him promptly or directed someone else to do so. If she had, she would have seen that his ulcer was getting worse, and she could have arranged for emergency treatment. In arguing that McArdle disregarded his serious medical need, Lacy relies on the following evidence: (1) McArdle knew that Lacy had diabetes, and she had identified him as a "high risk" patient in July 2017; (2) she reviewed Lacy's medical records from October 2017, which showed that none of Lacy's pedal pulses were palpable; (3) she reviewed Miller's notes, which noted a "deep" and "penetrating" ulcer; (4) she reviewed Lacy's most recent communications, which alleged that his pain "had increase[ed] 10-fold" and that his ulcer was "eating up" his body; and (5) she reviewed Lacy's recent progress notes, which would have shown that Lacy hadn't received any care since his appointment with Miller.

McArdle doesn't dispute that she reviewed all the documents that Lacy identifies. But she says that the information she had did not suggest to her that Lacy needed immediate attention, at least not from her. McArdle's primary argument is that she relied on her belief that nurses were following Miller's order to assess Lacy's condition daily. But the court has already rejected the argument as it applies to Miller. The only difference between Miller's argument on this issue and McArdle's argument is that McArdle says that she saw a nurse's initials next to Miller's order, which she interpreted to mean that nurses were complying with the order. Dkt. 113, ¶ 108. That fact doesn't help McArdle for the purpose of her motion for summary judgment because, as already discussed, Miller's order doesn't direct nurses to assess or monitor Lacy's condition, and it doesn't directly order the nurses to do anything. So a reasonable jury could infer that the presence of a nurse's initials didn't communicate to McArdle that nurses were monitoring the ulcer. Moreover, McArdle admits that she reviewed Lacy's recent progress notes, Dkt. 111, ¶ 74, which would have shown that no one had seen Lacy since December 15. So a reasonable jury could find that McArdle had no basis to believe that nurses were monitoring Lacy and that McArdle did not in fact rely on such a belief.

McArdle also argues in her brief that she did not believe that Lacy required immediate treatment because: (1) Miller had already examined Lacy on December 15; (2) Lacy's complaints of pain were "commonplace"; (3) Lacy's blisters had healed in the past; and (4) Lacy would have known that an appointment with a podiatrist would take time, which suggests that he was not asking for immediate treatment. A common problem with all of these arguments is that McArdle doesn't cite any evidence in her proposed findings of fact or her brief that she actually relied on any of these reasons when deciding how or whether to treat Lacy. That is enough to disregard the arguments for the purpose of McArdle's summary judgment motion.

16

But even if these reasons were part of McArdle's decisionmaking process on December 18, they would not entitle her to summary judgment. As for her alleged reliance on Miller's examination three days earlier, McArdle points to nothing in Miller's notes (other than his order about dressing changes, which the court has already discussed) that she could rely on to find that a podiatrist appointment at some time in the future was all Lacy needed. As for Lacy's history of complaining about pain and previous blisters that had healed, the court rejects those arguments for the same reasons that the court rejected those arguments from Miller.

This leaves McArdle's argument that it was reasonable for her to assume that Lacy didn't require immediate treatment because he asked for a form of treatment—an appointment with a podiatrist—that couldn't be provided immediately. A reasonable jury would not be required to accept that explanation. For one thing, Lacy did not simply ask for a podiatrist, he asked for "pain relief," and he said that he "need[ed] it bad." McArdle simply ignored that portion of Lacy's request. For another thing, Lacy is not a doctor, and he does not have the expertise to determine what treatment is appropriate. What matters is what Lacy told McArdle about his symptoms: he could "barely walk," his pain was increasing dramatically and radiating throughout his body, and his ulcer was "eating up his ligaments."

McArdle knew that Lacy was a high-risk diabetes patient who likely had poor blood flow in his feet. She also knew that Miller had described Lacy's ulcer as "deep" and "penetrating," but he ordered nothing except dressing changes for Lacy. And Lacy was now saying that his pain was much worse, and the ulcer was "eating up" his foot. A reasonable jury could find that McArdle knew that Lacy needed something more than just a future trip to the podiatrist. Rather, he needed immediate care, but McArdle refused to provide that. The court

will deny McArdle's summary judgment motion based on her contention that she did not consciously fail to provide Lacy with reasonable treatment.

## C. Causation

Lacy seeks compensation for two types of harm: (1) the loss of his toes, foot, and part of his leg; and (2) the pain he suffered between December 15 and December 24, when he was taken to the hospital and received dilaudid, an opioid, for his pain. Dkt. 106-10. Every claim filed under 42 U.S.C. § 1983 includes the element of causation, which has two components: cause-in-fact and proximate cause. *Whitlock v. Brueggemann*, 682 F.3d 567, 582–83 (7th Cir. 2012). Cause-in-fact means that "the injury would not have occurred absent the conduct," and proximate cause means that "the injury is of a type that a reasonable person would see as a likely result of his or her conduct." *Id.*

The court will consider whether Lacy may proceed to trial on either or both of his theories of harm.

### 1. Amputations

Lacy's theory is that all of his left leg could have been saved if he had been brought to the hospital sooner because he could have received vascular treatment such as an angioplasty that would have restored blood flow to the affected area. Both defendants contend that Lacy cannot prove cause-in-fact.[9] Specifically, defendants say that by December 15 it was too late

---

[9] McArdle also contends that Lacy can't show proximate cause, but most of her argument is devoted to explaining why she believes she acted reasonably, *see* Dkt. 78, at 21–23, not on whether amputations are a foreseeable consequence of failing to treat a foot ulcer. In any event, the court is concluding that Lacy hasn't adduced admissible evidence of cause-in-fact as it relates to his amputations, so it isn't necessary to consider proximate cause.

to prevent any of the amputations because Lacy's peripheral vascular disease had progressed too far by then, and his condition was irreversible.[10]

To support their argument that Lacy cannot prove cause-in-fact, defendants rely on the expert reports of Jonathan Cardella and John Golan, who are both vascular surgeons. Cardella says that Lacy's amputations were caused by peripheral arterial disease, a chronic condition that restricts blood flow to end organs such as feet and deprives them of oxygen, causing ulceration and preventing wounds from healing. Dkt. 93, at 2. Based on a review of Lacy's hospital records, Cardella believes that Lacy suffered from both tibial vessel disease (which is treatable with angioplasty) and microvascular disease (which is not treatable). *Id.* at 2–3. To reach this conclusion, Cardella relies on the following:

- no microscopic vessels beyond the midportion of Lacy's foot appeared on Lacy's January 3 angiogram, *id.* at 3;

- after Lacy's January 3 angioplasty, Lacy's transcutaneous oxygen level did not increase to the level one would expect in someone without microvascular disease, *id.* at 3; and

- the results of Lacy's photoplethysmography was consistent with microvascular disease, *id.* at 3–4.

Cardella concludes that "it would be very unlikely" for microvascular disease "to progress in . . . a rapid fashion" over a few days. *Id.* at 5.

Golan offers an opinion similar to Cardella. Dkt. 95. He adds that the tests performed at the hospital showed little improvement to the blood flow in his foot after the angioplasties, which suggests that the cause of the amputations was chronic rather than acute. *Id.* at 6.

---

[10] Defendants' theory on causation suggests that defendants should have intervened much sooner if they wished to prevent Lacy's amputations. But Lacy's claims are limited to defendants' conduct in December 2017, so the court does not consider whether any previous failures by defendants to provide care violated the Eighth Amendment.

Against the testimony of Cardella and Golan, Lacy relies on the reports of Ryan Herrington (a physician) and Michael Warshaw (a podiatrist). Herrington says that Lacy's symptoms were consistent with acute limb ischemia, which he defines simply as critically deficient blood flow, and that Lacy needed "prompt restoration of blood flow." Dkt. 96, at 12. He provides the following opinion on causation:

> More likely than not, had Dr. Miller met standard of care on 12/15/17, his ischemic foot would have been discovered and Mr. Lacy likely would have been able to access a vascular surgery specialist significantly sooner than he did and his candidacy for intervention accordingly assessed sooner than it was. Furthermore, more likely than not, the pattern and sequence of amputations that took place would not have occurred sparing Mr. Lacy from the pain and suffering that he no doubt experienced.
>
> . . .
>
> Had Mr. Lacy undergone an intervention to restore blood flow to his left foot prior to his development of gangrene which could have happened had Dr. Miller on 12/15/17 practiced within standard of care and assessed blood flow to left foot, the cascade of operations on 12/25/17, 01/03/18 and 01/10/18, more likely than not, would not have occurred.

*Id.* at 21–22. Herrington does not offer a causation opinion for McArdle.[11]

Warshaw provides the following opinion on causation for Miller:

> Dr. Miller's failures on December 15, 2017, caused Mr. Lacy to undergo a below-the-knee amputation. In other words, has Dr. Miller performed to the standard of care, even close to it, it is my opinion that Mr. Lacy would not have required that amputation.
>
> . . .

---

[11] In response to Herrington's opinion, Cardella says that Lacy did not have acute ischemia because: (1) that condition doesn't cause ulcers; it causes acute pain and motor and sensory changes to the foot; and (2) "a human cannot tolerate 9 days of acute ischemia." Dkt. 93, at 4.

> [If Miller has sent Lacy] to a higher level of care . . . Mr. Lacy's vascular status surely would have been assessed and remedial measures taken. . . . [T]hat Mr. Lacy saw vascular improvement after his angioplasty suggests that his lower leg was salvageable if the process had started sooner with adequate follow-up and supporting treatment.
>
> Further supporting my opinion is my long experience treating patients like Mr. Lacy. I practice full time in an area of Florida with a high concentration of elderly patients. I have seen and continue to see diabetic foot ulcers routinely. The standard treatments are effective at preventing below-the-knee amputation absent delay like that caused by Dr. Miller.

Dkt. 97, at 21.

As for McArdle, Warshaw says, "Ms. McArdle's failure to examine Mr. Lacy on December 11, 2017, caused Mr. Lacy to undergo a below-the-knee amputation. In other words, had Ms. McArdle performed to the standard of care, even close to it, it is my opinion that Mr. Lacy would not have required that amputation." *Id.* at 22.

Miller moves to strike Herrington and Warshaw's opinions on causation under Federal Rule of Evidence 702 for two reasons: (1) neither witness is qualified to offer an opinion on whether vascular intervention on December 15 could have prevented Lacy's amputations; and (2) neither witness provides a foundation for that opinion. Under Rule 702, an expert witness may offer an opinion if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case. In applying this test, courts consider three things: (1) the expert's qualifications; (2) the reliability of the expert's methodology; and (3) the relevance of the expert's testimony. *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 779 (7th Cir. 2017).

Whether proffered expert testimony is reliable enough to be admissible under Rule 702 is a matter for the court. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999).

Miller contends that neither Herrington nor Warshaw is qualified to offer an opinion about when vascular intervention can prevent an amputation. Miller cites testimony from Warshaw that the chronological progression of vascular occlusion is outside the scope of his practice, so he refers patients with that issue to other providers. Dkt. 88, at 83:9–12. And Miller cites testimony from Herrington in which he agreed that it would be "up to the vascular surgeon to decide" whether "treatment would have been possible to prevent an amputation." Dkt. 90, 85:16–20.

Lacy cites cases such as *Gayton v. McCoy*, 593 F.3d 610, 617 (7th Cir. 2010), in which the court stated that "courts often find that a physician in general practice is competent to testify about problems that a medical specialist typically treats." But this isn't a blanket rule that means that any physician is qualified to testify about any medical issue. Rather, the court "must look at each of the conclusions [the expert] draws individually to see if he has the adequate education, skill, and training to reach them." *Id.* In *Gayton*, the court of appeals ultimately upheld the district court's determination that a doctor wasn't qualified to testify that a prisoner would not have died if she had received her medications because the doctor didn't have specific knowledge of cardiology and pharmacology. *Id.* at 617–18.

In this case, Lacy doesn't point to any experience or training that would allow either Warshaw or Herrington to offer an opinion about the circumstances under which a foot ulcer might be successfully treated, or whether the progress of diabetes makes an amputation inevitable. But even if they were qualified to offer such opinions, Lacy doesn't respond to Miller's argument that neither expert provided foundation for his opinion.

The court concludes that Lacy's experts did not provide adequate reasons to support their conclusions. Herrington says: "[M]ore likely than not, the pattern and sequence of amputations that took place would not have occurred sparing Mr. Lacy from the pain and suffering that he no doubt experienced." Dkt. 96, at 21. He doesn't explain what that opinion is based on. It's well established that an opinion must be more than a conclusion. *See Downing v. Abbott Laboratories*, 48 F.4th 793, 809 (7th Cir. 2022). I conclude that Herrington's opinion that Lacy's amputations could have been prevented if Lacy had received treatment on December 15 is unsupported and thus inadmissible.

Warshaw rests his opinions on two things: (1) "Lacy saw vascular improvement after his angioplasty"; and (2) in his experience, "standard treatments are effective at preventing below-the-knee amputation absent delay." Dkt. 97, at 21. The first basis for Warshaw's opinion is an observation, not an explanation. It is true that Lacy's transcutaneous oxygen level rose in his left foot after he received an angioplasty.[12] But it's also undisputed that the level went down again soon after. *See* Dkt. 73-11, at 30. Warshaw doesn't explain why the temporary increase is an indicator that an earlier intervention could have made a more lasting difference.

Warshaw's second basis for his opinion is vague because he doesn't identify what he means by "standard treatments" or "delay," he doesn't identify a specific condition that standard treatments are effective for, and he doesn't tie his opinion to Lacy's particular situation. Warshaw admitted in his deposition that his opinion about "standard treatments" isn't about treatment that he provides. Rather, his testimony was that he would refer patients with "a circulation or a vascular issue" to a vascular specialist, and then those patients would

---

[12] Neither side explains what transcutaneous oxygen level is, but the parties appear to agree that it is an indicator of blood flow in the foot.

23

return from the specialist without an amputation "[m]ore often than not." Dkt. 88, at 100:12–101:18. That opinion is not based on Warshaw's own expertise, and it doesn't help to identify whether a nine-day delay caused any of Lacy's amputations. *See LaBrec*, 2023 WL 1505603, at *4 (excluding nurse's opinion that was based on her observations of orthopedic surgeons rather than her own expertise).

In his brief, Lacy relies on Cardella and Golan's testimony for the proposition that the treatment that Lacy received at the hospital could have healed his wound if it had been smaller. But that's not what either witness said. Rather, they said that it is possible for some patients who have a transcutaneous oxygen level that is similar to Lacy's after his angioplasty to heal a small wound. Dkt. 92 (Golan Dep. at 100:12–15); Dkt. 91 (Cardella Dep. at 10–16). Neither of them testified that a patient in Lacy's situation could have successfully healed his wound if he had received vascular treatment 10 days earlier. In fact, Golan testified at length about why he believed that Lacy's wound would not have healed even if it had been smaller. Dkt. 92, at 100:16–102:16.

The bottom line is that the expert testimony of Cardella and Golan is unrefuted. Lacy's experts do not address whether Lacy's amputations were caused by microvascular disease or whether microvascular disease could have been successfully treated on December 15. And Lacy's experts do not support their own opinions that the nine-day delay in receiving vascular treatment is what caused Lacy's amputations. So defendants are entitled to summary judgment on this issue. *See Walker v. Peters*, 233 F.3d 494, 502 (7th Cir. 2000) (granting summary judgment to the defendant on an Eighth Amendment medical care claim after striking the plaintiff's expert report as speculative).

### 2. Pain

Lacy also says that defendants' delay in seeking emergency treatment caused him days of unnecessary pain. When Lacy went to the hospital he received an opioid drug for his pain, and Lacy says that he could have received that medication sooner if defendants had sent him to the hospital sooner.

Unnecessarily prolonged pain is a compensable harm for an Eighth Amendment violation, even if the prisoner cannot prove that the defendants caused a more tangible injury. *See Gayton,* 593 F.3d at 624–25 ("[T]he plaintiff need not prove that [the defendant's] inaction necessarily led to [the prisoner's] death, but rather that her suffering was exacerbated by [the defendant's] failure to provide her with adequate medical care."). Neither defendant contends that it is unreasonable to infer that Lacy would have received more effective pain medication sooner if they had identified his situation as an emergency sooner. Instead, Miller says that he shouldn't be blamed for Lacy's pain for two reasons: (1) he made reasonable treatment decisions for Lacy, including prescribing Excedrin for Lacy's pain; and (2) any delay in bringing Lacy to the hospital was the result of nursing staff's failure to assess Lacy's condition on a daily basis as Miller instructed.

Miller's first argument is about deliberate indifference, not causation. Lacy isn't contending that Miller violated the Eighth Amendment by prescribing him Excedrin. Rather, he's contending that he would have received more effective medication sooner if Miller had determined on December 15 that Lacy needed emergency care. The court already determined that a reasonable jury could agree with Lacy that Miller's failure to act with more urgency on December 15 violated the Eighth Amendment, so it isn't necessary to discuss that issue further.

Miller's second argument fails as well. As already discussed, a reasonable jury could find that Miller did not direct nurses to monitor Lacy's condition. And even if Miller did believe that nurses were assessing Lacy daily, that would not excuse Miller's own alleged failures on December 15. So the court will allow Lacy to proceed to trial on a claim that Miller violated the Eighth Amendment by failing to seek emergency treatment for Lacy on December 15 and that Miller's failure caused Lacy another nine days of increased pain and suffering.

McArdle's argument also fails. She says that she cannot be held liable because Lacy's pain was caused by his vascular disease, so it was not "foreseeable." Dkt. 78, at 23. But McArdle didn't need to "foresee" Lacy's pain because Lacy told her about his pain in his December 17 communications. Lacy may proceed against McArdle on a claim that she violated his Eighth Amendment rights on December 18 by refusing to provide prompt care in response to Lacy's December 17 communications and that her refusal caused Lacy another six days of increased pain and suffering.

ORDER

IT IS ORDERED that the motions for summary judgment filed by Kenneth Miller, Dkt. 70, and Sandra McArdle, Dkt. 77, are GRANTED in part and DENIED in part. The motions are denied on the following claims and issues: (1) Miller violated the Eighth Amendment on December 15 by failing to seek emergency treatment for Lacy, and Miller's failure caused Lacy another nine days of increased pain and suffering; and (2) McArdle violated the Eighth Amendment on December 18 by refusing to provide prompt care in response to

Lacy's December 17 communications, and her refusal caused Lacy another six days of increased pain and suffering. The motions are GRANTED in all other respects.

Entered May 8, 2023.

BY THE COURT:

/s/

_____

JAMES D. PETERSON
District Judge

27